## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SANJIV MEHROTRA, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>JOSEPH L. WELCH, ALBERT ERNST, CHRISTOPHER H. FRANKLIN, EDWARD G. JEPSEN, DAVE R. LOPEZ, HAZEL R. O'LEARY, THOMAS G. STEPHENS, G. BENNETT STEWART III, LEE C. STEWART, ITC HOLDINGS CORP., FORTISUS INC., and ELEMENT ACQUISITION SUB INC.<br><br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　**CASE NO.:**<br><br>　**CLASS ACTION**<br>　**COMPLAINT**<br><br>　**JURY TRIAL DEMANDED** |

Plaintiff, Sanjiv Mehrotra, by his undersigned attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### NATURE OF THE ACTION

1.　Plaintiff brings this action, individually, against ITC Holdings Corp. ("ITC" or the "Company") and ITC's Board of Directors (the "Board" or the "Individual Defendants") for violations of Sections 14(a) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder, and as a class action on behalf of the stockholders of ITC for the Board's breaches of fiduciary duties, in connection with the proposed acquisition of ITC's publicly owned shares by Fortis, Inc. ("Fortis"), through its wholly-owned U.S. subsidiaries, Fortis US, Inc. ("Parent") and Element Acquisition Sub Inc. ("Merger Sub, and collectively  with Fortis and Parent, "Fortis").

2.      On February 9, 2016, Fortis and the Company announced a definitive agreement (the "Merger Agreement") under which Fortis will acquire ITC for $22.57 per share in cash and 0.7520 Fortis shares per ITC share (the "Proposed Transaction") with ITC continuing as the surviving corporation and subsidiary of Parent.  The Proposed Transaction merger consideration is valued at $44.90 per share based on the February 8, 2016 Fortis closing price, and the entire transaction is valued at approximately $11.3 billion.  The Proposed Transaction is expected to close in late 2016.

3.      Upon closing, ITC stockholders will own 27% of the combined company.  A lengthy regulatory approval process is expected.  Additionally, Fortis will apply to have its shares listed on the New York Stock Exchange ("NYSE") and continue to have its shares listed on the Toronto Stock Exchange ("TSE").

4.     The Individual Defendants have breached their fiduciary duties by, among other things, conducting an unfair process and agreeing to the Proposed Transaction without obtaining fair and maximum consideration for the Company's stockholders.  In negotiating the terms of the Proposed Transaction, the Individual Defendants failed to negotiate a collar on the stock portion of the merger consideration.  Thus, the total consideration ITC stockholders receive is subject to the performance of Fortis' publicly traded stock, which has declined since the announcement of the Proposed Transaction.  Further, as announced on April 20, 2016, Fortis sold off a 19.9% stake in ITC to GIC Private Limited, Singapore's sovereign wealth fund, for aggregate consideration of $1.228 billion in cash to finance the Proposed Transaction.  Financing will also be achieved through increasing Fortis' debt to the tune of an issuance of approximately $2 billion, which will ultimately dilute the value of the stock portion of the merger consideration.

5.     Indeed, Yahoo! Finance reports that at least one analyst has set a target price of $45.00 per share for ITC, $0.10 above the value of the merger consideration stated in the press release announcing the Proposed Transaction.

6.     Even further, the sale process conducted by the Board was flawed and conflicted as it was designed to ensure that the Individual Defendants and other ITC insiders reap substantial financial benefits not shared by the Company's

3

stockholders, including the accelerated vesting of unvested equity-based awards. Moreover, Fortis intends on retaining all of ITC's employees with ITC's management also remaining in place. ITC will also maintain its corporate headquarters in Novi, Michigan.

7. Despite agreeing to the Proposed Transaction for inadequate consideration, the Individual Defendants further breached their fiduciary duties by agreeing to deal protection provisions that, when viewed together, could potentially inhibit bidders from making a successful competing offer for the Company. Specifically, pursuant to the Merger Agreement dated February 9, 2016, the Individual Defendants agreed to: (i) a strict no-solicitation provision that prohibits the Company from soliciting other potential acquirers or from continuing ongoing discussions with potential acquirers; (ii) a provision that provides Fortis with three (3) business days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay Fortis a $245 million termination fee in order to enter into a transaction with a superior bidder. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of ITC.

8. Finally, on March 17, 2016, in connection with the Proposed Transaction, Defendants filed, or caused to be filed, a materially incomplete and

misleading Registration Statement on Form F-4 (the "Registration Statement") with the U.S. Securities and Exchange Commission ("SEC") in violation of Sections 14(a) and 20(a) of the Exchange Act. The Registration Statement, which recommends that ITC stockholders vote in favor of the Proposed Transaction, fails to provide the Company's stockholders with material information and/or provides them with materially misleading information concerning: (i) the unfair sale process underlying the Proposed Transaction; (ii) the financial valuation analyses prepared by Lazard Frères & Co. ("Lazard"), Barclays Capital Inc. ("Barclays"), and Morgan Stanley & Co. LLC ("Morgan Stanley"), the Company's financial advisors; and (iii) ITC and Fortis management's projections, utilized by Lazard, Barclays, and Morgan Stanley in their financial analyses.

9.     For these reasons and as set forth in detail herein, the Individual Defendants have breached their fiduciary duties and violated federal securities laws. Plaintiff seeks to enjoin the Proposed Transaction unless and/or until defendants cure their breaches, or ,in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants violations of their fiduciary duties of loyalty, good faith, and due care.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) and

20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

11.   This Court has personal jurisdiction over each of the Defendants because each is either a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.  ITC is incorporated in Michigan and is headquartered in this District.  Each of the Individual Defendants, as Company officers or directors, either reside in this District or have extensive contacts with this District.

## PARTIES

13.   Plaintiff is, and has been at all relevant times, the owner of shares of common stock of ITC.

14.    ITC is a corporation organized and existing under the laws of the State of Michigan. It maintains its principal executive offices at 27175 Energy Way, Novi, Michigan 48377.  ITC is the largest independent electric transmission company in the United States.  The Company invests in the electric transmission grid to improve reliability, expand access to markets, allow new generating resources to interconnect to its transmission systems and lower the overall cost of delivered energy. ITC is currently traded on the New York Stock Exchange under the ticker symbol "ITC."

15.    Defendant Joseph L. Welch ("Welch") has been a director and the President Chief Executive Officer of the Company since it began operations in 2003.  Welch served as Treasurer of the Company until April 2009.  Welch has also served as Chairman of the Board since May 2008.  According to the Definitive Proxy Statement filed on Schedule 14A with the SEC on April 4, 2015, as the founder of ITCTransmission, Welch has had overall responsibility for the Company's vision, foundation and transformation into the first independently owned and operated electricity transmission company in the United States.

16.    Defendant Albert Ernst ("Ernst") has been a director of the Company since August 2014.

17.    Defendant Christopher H. Franklin ("Franklin") has been a director of the Company since August 2011.

18.     Defendant Edward G. Jepsen ("Jepsen") has been a director of the Company since July 2005.

19.     Defendant Dave R. Lopez ("Lopez") has been a director of the Company since August 2014.

20.     Defendant Hazel R. O'Leary ("O'Leary") has been a director of the Company since July 2007.

21.     Defendant Thomas G. Stephens ("Stephens") has been a director of the Company since November 2012.

22.     Defendant G. Bennett Stewart III ("Stewart, III") has been a director of the Company since July 2006.

23.     Defendant Lee C. Stewart ("Stewart") has been a director of the Company since August 2005.

24.     Defendants referenced in ¶¶ 15 through 23 are collectively referred to as Individual Defendants and/or the Board.

25.     Non-party Fortis is a corporation existing under the Corporations Act of Newfoundland and Labrador with its principal place of business at Fortis Place, Suite 1100, 5 Springdale Street, St. John's, NL A1B 3T2, Canada.  Fortis is a leader in the North American electric and gas utility business.  Fortis's regulated utilities serve more than three million customers across Canada and in the United States and the Caribbean, and Fortis owns long-term contracted hydroelectric

generation assets in British Columbia and Belize. Fortis is currently traded on the Toronto Stock Exchange under the ticker symbol "FTS."

26.    Defendant Parent is a Delaware corporation and a wholly owned subsidiary of Fortis.

27.    Defendant Merger Sub is a Michigan corporation and a direct wholly owned subsidiary of Parent.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

28.    By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public stockholders of ITC and owe them, as well as the Company, a duty of care, loyalty, good faith, candor, and independence.

29.    Under Michigan law, where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's stockholders and, if such transaction will result in a change of corporate control, the stockholders are entitled to receive a significant premium. To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

2:16-cv-11449-GCS-DRG   Doc # 1   Filed 04/22/16   Pg 10 of 63   Pg ID 10

(a)     adversely affects the value provided to the corporation's stockholders;

(b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's stockholders; and/or

(d)     will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public stockholders.

30.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)     participating in any transaction where the Individual Defendants' loyalties are divided;

(b)     participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public stockholders.

31.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly

violating their fiduciary duties, including their duties of care, loyalty, good faith, candor, and independence owed to Plaintiff and other public stockholders of ITC.

## CLASS ACTION ALLEGATIONS

32.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on its own behalf and as a class action on behalf of all owners of ITC common stock and their successors in interest, except Defendants and their affiliates (the "Class").

33.   This action is properly maintainable as a class action for the following reasons:

(a)   the Class is so numerous that joinder of all members is impracticable.  According to the Merger Agreement, as of close of business on February 8, 2016, 152,720,196 shares of common stock were represented by the Company as outstanding.

(b)   questions of law and fact are common to the Class, including, inter alia, the following:

(i)   Have the Individual Defendants breached their fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, due care, and fair dealing;

11

(ii)    Have the Individual Defendants breached their fiduciary duty to secure and obtain the best consideration reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii)    Have the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(iv)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated;

(v)    Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

(c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)    Plaintiff's claims are typical of those of the other members of the Class.

(e)    Plaintiff has no interests that are adverse to the Class.

12

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy

## SUBSTANTIVE ALLEGATIONS

### *The Company's Recent Strong Performance and Poise for Growth*

34.     ITC's business consists primarily of the electric transmission operations of its Regulated Operating Subsidiaries.  In 2002, the Company was incorporated in the State of Michigan for the purpose of acquiring ITCTransmission and became a publicly traded company in 2005.  The Company owns and operates high-voltage systems in Michigan's Lower Peninsula and portions of Iowa, Minnesota, Illinois, Missouri, Kansas and Oklahoma that transmit electricity from generating stations to local distribution facilities

connected to its systems.  The Company's strategy is to own, operate, maintain and invest in transmission infrastructure in order to enhance system integrity and reliability, reduce transmission constraints and allow new generating resources to interconnect to its transmission systems.

35.    On July 30, 2015, the Company issued a press release announcing financial results for the second quarter of 2015. The Company reported net income of $72.3 million, compared to net income of $54.3 million from the second quarter of 2014.  The Company also reported an increase in operating earnings of $80.8 million for the second quarter of 2015, compared to operating earnings of $72.7 million for the second quarter of 2014.  Defendant Welch was quoted in the press release as stating: "We are pleased to report another strong quarter in which we met our operational and financial targets.   During the second quarter, we completed the largest project in ITC's history, the Thumb Loop project at ITC *Transmission* ahead of schedule and under budget, while also delivering operational excellence to our customers and superior growth to our shareholders."

36.    On November 5, 2015, the Company reported its financial results for the third quarter of 2015.  Although net income was down 11% year-over-year, the Company announced an increase in operating earnings of $82.3 million for the third quarter of 2015, as compared to operating earnings of $73.7 million for the

third quarter of 2014.  The Company also reported 15% dividend increase for the third quarter of 2015.

37.    Then, on February 25, 2016, the Company issued a press release announcing financial results for its fourth quarter and year ended 2015 results.  For the fourth quarter, the Company reported operating earnings of $87.6 million, compared to operating earnings of $75.9 million for the same period in 2014.  For the full year 2015, the Company reported operating earnings of $323.8 million, compared to operating earnings of $292 million for the prior year.  Defendant Welch commented on the results during the Company's fourth quarter conference call and webcast stating:

> From a financial perspective, we had another strong year with 2015 operating earnings of $2.08 per diluted share, which was well within our guidance range and marks the ninth consecutive year of double-digit annual operating earnings growth.  To that end, we continue to see double-digit earnings growth in the years to come as evidenced by our revised capital investment forecast through 2018 at our regulated operating companies . . . On the value return front, we continue to honor our commitments to shareholders by increasing the dividend by approximately 15% in August of 2015 and concluding our $115 million accelerated share repurchase program in November. Effectively using the remaining capacity of Board authorized share repurchases.  Together, these efforts highlight the operational and financial strength of the business, which we believe will continue to yield long-term benefits for our customers and investors.

38.    Fortis is seeking to acquire the Company at the most opportune time, at a time when the Company is performing very well and is positioned for tremendous growth.

*The Inadequate Sale Process*

39.     On March 24, 2015, a representative of Party A, an affiliate of a U.S. publicly traded company, contacted ITC to arrange a meeting with Defendant Welch.   Over the next few weeks, Party A and ITC met to discuss Party A's interest in a potential transaction with ITC.   ITC's management also met with Barclays and Morgan Stanley representatives in April and June 2015, respectively, to discuss potential strategic alternatives.

40.     On July 21, 2015, Party B, a U.S. publicly traded company, contacted Defendant Welch to express interest in a meeting, which was agreed to yet never scheduled.

41.     Between July 27, 2015 and August 4, 2015, Defendant Welch and ITC Senior Vice President and Chief Financial Officer, Rejji Hayes ("Hayes") met with each member of the Board to discuss, among other things, Morgan Stanley's preliminary findings with respect to potential strategic alternatives of ITC and Party A's possible interest in a transaction with ITC.

42.     On August 24, 2015, ITC and Party A entered into a non-disclosure agreement ("NDA"), which contained a standstill restriction.

43.     Throughout September 2015, the discussions between Party A and ITC continued and Party A and its advisors conducted a due diligence review of ITC.

44.    On September 29, 2015, Party A's CEO made a verbal proposal to acquire ITC for $39.00 per share in an all-cash transaction.

45.    On October 23, 2015, a representative of Goldman Sachs, on behalf of Fortis, contacted Hayes to discuss Fortis' interest in a possible acquisition of ITC. Thereafter, on October 26, 2015, Defendant Welch contacted Barry Perry, President and CEO of Fortis, to discuss Fortis' potential interest in a transaction with ITC.

46.    On October 27, 2015, Party C, a financial party, contacted ITC to arrange a call with Defendant Welch.  Subsequently, on October 31, 2015, a managing director of Party C had a telephone call with Defendant Welch to express Party C's potential interest in a transaction with ITC.

47.    On November 2, 2015, ITC and Fortis entered into an NDA, which included a standstill restriction.

48.    On November 3, 2015, at a Board meeting, the Board instructed management to conduct a process to gauge potential interest from other third parties and authorized management to formally engage financial advisors to assist ITC in such a process.

49.    On November 5, 2015, ITC and Party C entered into an NDA, which included a standstill restriction.

50.     Also, on November 5, 2015, ITC engaged Barclays and Morgan Stanley as financial advisors in connection with the strategic review process.

51.     On November 9, 2015, Barclays and Morgan Stanley only contacted five parties – four of which had already expressed interest in the Company (Party A, Party B, Party C, and Fortis – to assess their potential interest in a potential transaction. The fifth party was Party D, a financial party. The next day, Party A declined to participate in the strategic review process for undisclosed reasons.

52.     On November 12, 2015, Fortis submitted a preliminary proposal to ITC with an indicative price of $44.25 per share in cash and requested exclusive negotiations with ITC.

53.     On November 13, 2015, ITC and Party B entered into an NDA, which included a standstill restriction.

54.     On November 21, 2015, access to an electronic data room was provided to each party in the strategic review process which had previously entered into an NDA with ITC. Party D subsequently entered into an NDA with ITC, which contained a standstill restriction.

55.     On November 23, 2015, the Board determined not to contact additional parties at that time.

56.     On November 30, 2015, Party B indicated that it was not in a position to pursue a transaction with ITC and ceased its participation in the sale process.

57.    On November 30, 2015 an article appeared in BloombergNews.com, reporting that ITC was working with financial advisors to conduct a sale process and suggesting a transaction value of $45.00 per share.  Upon publication of the story, ITC's stock rose to $37.84 per share.

58.    Between November 30, 2015 and December 16, 2015, 26 potentially interested parties contacted representatives of Barclays and Morgan Stanley to inquire about the strategic review process, including some of the parties already contacted as well as Party E (a financial party) and Party F (a strategic party).

59.    On December 2, 2015, the Board determined to establish an administrative committee of the Board (the "Committee"), consisting of Defendants Ernst, O'Leary, and Stewart, to assist the Board in connection with engagement of and interaction with legal and other advisors in connection with the sale process.

60.    On December 7, 2015, Party D indicated that it was not in a position to pursue a transaction involving ITC.

61.    On December 9, 2015, a draft of a merger agreement was provided to each continuing participant in the process that had previously executed an NDA with ITC and expressed interest in a potential transaction with ITC, with instructions to submit any comments to the draft merger agreement by January 5, 2016 and a definitive valuation proposal by January 11, 2016.

62.     On December 10, 2015, Party E entered into an NDA with ITC, which included a standstill restriction.

63.     On December 17, 2015, at a Board meeting, the Board discussed the strategic review process, including, among other things, hiring a financial advisor that had not previously worked for ITC to advise the Board in connection with the strategic review process and other potential strategic alternatives available to ITC. Ultimately, the Board engaged Lazard to act as its third financial advisor.

64.     On December 18, 2015, Party C, Party E, and Party F (together, the "Consortium") sought ITC's consent to partner together with respect to a potential transaction with ITC.  On the same day, Party F also entered into an NDA, which contained a standstill restriction.   Also, the Consortium and ITC executed a teaming agreement to allow the Consortium to enter into discussions and arrangements with respect to a potential transaction with ITC.

65.     Throughout January 2016, ITC and Fortis exchanged mark-ups of draft merger agreements and discussed certain provisions thereof, including certain employee benefits and retention issues.  On January 8, 2016, Defendant Welch and Hayes requested that Fortis consider modifications to their mark-up to the merger agreement that would provide additional flexibility regarding senior management succession planning.   Fortis sought to have veto power over any ITC senior management changes between signing a merger agreement and consummation of a

transaction.  Further, the Consortium was unable to meet the January 5 deadline but stated that it would send its revisions and a proposal offer by January 11, 2016.

66.    At a meeting of the Committee on January 10, 2016, the Committee discussed, among other things, Defendant Welch's willingness to continue to serve as CEO of ITC during a transition period and the related effects of doing so under his employment agreement.

67.    On January 11, 2016, Fortis submitted a proposal to acquire ITC for $44.25 per share in cash (the "January 11 Fortis Proposal").  However, later that same day, Fortis withdrew the January 11 Fortis Proposal after Fortis received an unexpected unfavorable report from a national debt rating agency service regarding the proposal.  ITC management, in consultation with the Board, decided to extend the deadline of the strategic review process.  Also on January 11, 2016, the Consortium submitted a proposal to acquire ITC for $37.00 per share in an all cash transaction, subject to, among other things, completion of an advisory and evaluation process with certain rating agencies and completion of its confirmatory due diligence process, which, as previously communicated to ITC by the Consortium, would require an additional three to four weeks to complete.

68.    On January 16, 2016, an undisclosed director of ITC affiliated with Party G, a U.S. publicly traded company, informed Defendant Welch that Party G might be interested in exploring a potential merger of Party G and ITC.  The ITC

director affiliated with Party G also verbally expressed an interest in a stock-for-stock transaction with a preliminary valuation of ITC at approximately $45.00 per share. This undisclosed director purportedly recused himself from the sale process later that day.

69.     During the week of January 16, 2016, ITC sought to increase the value of the proposals from both Fortis and the Consortium. Barclays and Morgan Stanley also contacted Party A to discuss submitting a revised proposal to acquire ITC at a price higher than the initial proposal of $39.00 per share in an all-cash transaction.

70.     On January 22, 2016, the Consortium submitted a revised proposal, increasing its offer to $37.35 per share in an all-cash transaction.

71.     Following the Board's January 25, 2015 meeting, Barclays and Morgan Stanley contacted Party A, the Consortium, Party G, and Fortis to advise them that ITC needed their best and final offers before a February 1, 2016 scheduled Board meeting. On January 26, 2016, Party G submitted a letter to ITC expressing its interest in an all-stock transaction valued in a range of $39.00 to $42.00 per share. ITC then entered into an NDA with Party G, which included a standstill restriction.

72.     On January 29, 2016, at ITC's request, Party A verbally reaffirmed its all-cash offer to acquire ITC at $39.00 per share and indicated that it would not increase its proposed valuation.

73.     On February 1, 2016, an article appeared in Bloomberg News stating that ITC had received bids to acquire ITC, including a bid from Fortis.  ITC's common stock closed at $40.33 per share that day.

74.     On February 3, 2016, Fortis delivered a revised proposal to acquire ITC for a combination of cash and Fortis stock consisting of $22.57 in cash and 0.7520 Fortis common shares per ITC share, representing, at the time, a total value of $44.46 per share.  Also, on February 3, 2016, Party G delivered a revised proposal to acquire ITC in an all-stock transaction valuing ITC within a range of $40.00 to $43.00 per share.  Notably, ITC failed to use Fortis' bid as leverage in discussions with Party G, or even push Fortis for a higher prices, and instead proceeded to finalize a transaction with Fortis.

75.     Following additional reverse due diligence and discussions between ITC and Fortis concerning terms of the Merger Agreement and certain employee benefits and retention matters, on February 8, 2016, the Board met to consider the Proposed Transaction.  Barclays, Morgan Stanley, and Lazard, presented each of their financial analyses of ITC and Fortis, as well as comparisons of the merger consideration offered by Fortis to the proposals from Party A, the Consortium, and

Party G.  During this meeting, Party G delivered a revised proposal to enter into a transaction with ITC in an all-stock transaction, valuing ITC at approximately $43.25 per share.  Despite Party G's clear willingness to continue to increase its proposal, the Board barely entertained the idea of continuing to negotiate with Party G.

76.     Instead, the Board (excluding the undisclosed Board member affiliated with Party G) unanimously approved the Merger Agreement and approved an amendment to Defendant Welch's employment agreement (with Welch abstaining) that, among other things, provided his employment would become "at will" effective as of December 21, 2015.

**The Proposed Transaction Fails to Offer Adequate Stockholder Value**

77.     After announcing that the Board commenced a review of the Company's strategic alternatives on November 30, 2015, the Company announced, on February 9, 2016, that it had entered into the Merger Agreement with Fortis pursuant to which Fortis, through Parent and Merger Sub, will acquire all the Company's common stock for $22.57 per share in cash and 0.7520 Fortis shares per ITC share.  Based on Fortis's closing price on February 8, 2016, the day before the Proposed Transaction was announced, the deal values ITC at around $44.90 per share.

78.     Given the Company's recent strong performance and its positioning for growth, the Proposed Transaction consideration is inadequate and undervalues the Company.

79.     In December 8, 2015 article published on *SeekingAlpha.com*, the author listed ITC as its highest conviction takeover target for 2016 with an estimated fair value of $44-$47 per share.  Thus, the implied per share value of $44.90 falls on the lower end of the range suggested by *Seeking Alpha*.

80.     Further, according to Yahoo! Finance, at least one analyst has set a target price for the Company at $45.00 per share.

81.     Additionally, the Individual Defendants' failed to obtain a collar on the stock portion of the Proposed Transaction consideration.  The ITC stockholders are at the mercy of the value of Fortis stock at the time that the Proposed Transaction will be effectuated.  The value of Fortis' stock dropped by $4.24 to close at $37.14 on February 9, 2016, following the announcement of the Proposed Transaction.  Thus, it is possible that the overall value of the Proposed Transaction will actually end up being substantially below $44.90 per share, due to fluctuations in Fortis's stock price and the component of the consideration that is comprised of such stock.

82.     In an article published on February 10, 2016 by *Bloomberg News*, author Jim Polson stated the following:

> Shares of ITC Holdings slid as much as 5.7 percent on Tuesday after Fortis Inc. announce it planned to buy the power-line company for $6.9 billion. That's because the price tag fell below the market's expectations. The ensuing slide in Fortis shares also weighed on ITC, whose stock is now linked to its future owner.
>
> "There was anticipation of a higher price," Christopher Pultz, fund manager at Kellner Management LP in New York.

83.     The *Bloomberg News* article also pointed out that ITC closed down 1.9% and Fortis shares slid 10% on the Toronto Stock Exchange shortly after the Proposed Transaction was announced.

84.     The Proposed Transaction allows Fortis to catapult off of ITC's already established large footprint in the U.S. Midwest market and is undoubtedly valuable to Fortis. Indeed, in the press release announcing the Proposed Transaction, Barry Perry, President and CEO of Fortis remarked:

> Fortis has grown its business through strategic acquisitions that have contributed to strong organic growth over the past decade. Our performance in 2015 is a clear demonstration of the success of this strategy. The acquisition of ITC – a premier pure-play transmission utility – is a continuation of this growth strategy. ITC not only further strengthens and diversifies our business, but it also accelerates our growth.

85.     The Board failed to secure an adequate price for the Company, either for the intrinsic value of its assets or the value of the Company's assets to Fortis.

***The Board Stands to Receive Different Consideration than the Company's Stockholders***

86.     Further, pursuant to the Merger Agreement and as set out in the Registration Statement, the treatment of the Individual Defendants' options, restricted stock, and performance shares is different than the consideration stockholders will receive as a result of the Proposed Transaction.

87.     Indeed, while ITC's public stockholders are receiving inadequate consideration for their ITC holdings, the Company's directors and officers stand to receive substantial personal financial benefits.  Defendant Welch and the other Individual Defendants, along with other senior officers, own 3.3% of the Company.  Thus, by steering the sale process to a transaction with Fortis, they will liquidate their otherwise illiquid equity holdings in ITC through provisions in the Merger Agreement that accelerate and otherwise cash out restricted equity interests (e.g., unvested options and restricted stock units).  Specifically, pursuant to the Merger Agreement, upon consummation of the Proposed Transaction, ITC's directors and officers will receive cash payments from the immediate vesting of all outstanding stock options, restricted stock units and performance-based awards, whether vested or unvested.  As provided in the Registration Statement, the following table summarizes the amounts that directors and officers would receive in respect of unvested stock options, restricted stock awards, and performance shares:

**Estimated Value of ITC Stock Options, Restricted Stock and Performance Shares**
**Held by Executive Officers and Non-Employee Directors**

| | Unvested Stock Options | Vested but Unexercised Stock Options | Restricted Stock | Performance Shares at Target Performance | Performance Shares at Maximum Performance | Equivalent Performance Shares | Total (at Target performance) |
|---|---|---|---|---|---|---|---|
| **All Executive Officers as a Group** | $ 5,310,379 | $ 40,163,691 | $ 7,283,997 | $ 4,293,052 | $ 8,586,103 | $ 68,035 | $ 4,361,086 |
| **Non-Employee Director** | | | | | | | |
| Albert Ernst | — | — | $ 133,193 | — | — | — | — |
| Christopher H. Franklin | — | — | $ 290,803 | — | — | — | — |
| Edward G. Jepsen | — | — | $ 290,803 | — | — | — | — |
| David R. Lopez | — | — | $ 133,193 | — | — | — | — |
| Hazel R. O'Leary | — | — | $ 290,803 | — | — | — | — |
| Thomas G. Stephens | — | — | $ 290,803 | — | — | — | — |
| G. Bennett Stewart, III | — | — | $ 290,803 | — | — | — | — |
| Lee C. Stewart | — | — | $ 290,803 | — | — | — | — |
| Total | $ 5,310,379 | $ 40,163,691 | $ 9,295,201 | $ 4,293,052 | $ 8,586,103 | $ 68,035 | $ 4,361,086 |

88.     Further, the Company's executives appear to have secured employment following closing of the Proposed Transaction with the combined company.  Specifically, the Registration Statement provides that "Fortis does not contemplate terminating any of the named executive officers in connection with the completion of the merger."

89.     However, if ITC's named executive officers are terminated in connection with the Proposed Transaction, they are still set to receive substantial cash payments in the form of severance benefits.  As set forth in the chart below, in total, ITC's named executive officers stand to receive over $33.6 million in golden parachute compensation, with Defendant Welsh set to receive nearly $14 million himself:

| Name | Cash (US$)[1] | Equity (US$)[2] | Pension / NQDC (US$)[3] | Perquisites/ Benefits (US$)[4] | Tax Reimbursement (US$)[5] | Other (US$)[6] | Total (US$)[7] |
|---|---|---|---|---|---|---|---|
| | | | | (in US dollars) | | | |
| Joseph L. Welch | 5,219,607 | 8,149,965 | — | 30,000 | — | — | 13,399,572 |
| Linda H. Blair | 2,751,426 | 3,632,953 | — | 439,652 | — | — | 6,824,031 |
| Rejji P. Hayes | 1,472,919 | 2,276,974 | 63,912 | 53,307 | — | — | 3,867,112 |
| Jon E. Jipping | 2,249,361 | 2,969,990 | — | 53,306 | — | — | 5,272,657 |
| Daniel J. Oginsky | 1,875,440 | 2,382,951 | — | 52,440 | — | — | 4,310,831 |

90.     The personal benefits that members of the Board and Company management stand to receive were key factors in their decision to pursue the Proposed Transaction with Fortis.  Instead of attempting to negotiate an agreement reflecting the best consideration reasonably available for the ITC stockholders they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Transaction to meet their own needs and objectives.  The Board's efforts to advance its members' personal interests at the expense of the Company's public stockholders has resulted in the inadequate Proposed Transaction being presented to the stockholders at an untenable and inadequate price.

***The Unreasonable Deal Protection Devices***

91.     In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to improperly restrain competing offers for the Company from emerging.

92.     Section 7.1 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential

acquirers in order to procure a price in excess of the amount offered by Fortis. Section 7.1(a) demands that the Company immediately cease and terminate any and all prior or existing discussions with other potential acquirers.

93.     Pursuant to Section 7.1(d) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify Fortis of the material terms and conditions of the bidder's offer.   Section 7.1(d) also demands that should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Fortis in order to enter into the competing proposal, it must grant Fortis three (3) business days in which the Company must negotiate in good faith with Fortis (if requested by Fortis), including by making the Company's officers and representatives reasonably available to negotiate) and allow Fortis to amend the terms of the Merger Agreement to make a counter-offer so that such competing proposal would cease to constitute a superior proposal.   In other words, the Merger Agreement gives Fortis access to any rival bidder's information and allows Fortis a free right to top any superior offer simply by matching it.   Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Fortis, which can piggy-back upon the due diligence of the foreclosed second bidder.

94.     Section 9.2 of the Merger Agreement also provides that a termination fee of $245 million must be paid to Fortis by ITC if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the stockholders with a superior offer.

95.     Ultimately, these deal protection provisions unreasonably restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

### The Materially Incomplete and Misleading Registration Statement

96.     Defendants have failed to provide stockholders with material information necessary for an informed vote on the Proposed Transaction.  The Registration Statement, which recommends that the Company's stockholders vote in favor of the Proposed Transaction, misrepresents and/or omits material information in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Registration Statement fails to provide the Company's stockholders with material information concerning: (i) the unfair sale process

underlying the Proposed Transaction; (ii) the financial valuation analyses prepared by Lazard, Barclays, and Morgan Stanley, the Company's financial advisors; and (iii) ITC and Fortis management's projections, utilized by Lazard, Barclays, and Morgan Stanley in their financial analyses.

97.     With respect to the sale process, the *Background of the Merger* section contained on pages 52-63 of the Registration Statement is false and/or misleading in that it fails to provide material information concerning the process conducted by the Board, including:

(a)     The basis and rational for the Board's support of a fixed exchange ratio as part of the merger consideration in the Proposed Transaction;

(b)     The basis for the Board's retention of three financial advisors in connection with the Proposed Transaction;

(c)     The basis for the Board waiting until November 3, 2015 to instruct the Company's financial advisors to conduct an outreach to gauge potential interest from other third parties, despite the ongoing talks with several interested potential counterparties since March 2015;

(d)     The actions taken, if any, by Barclays and Morgan Stanley to determine that there were no credible parties to contact about a potential transaction beyond Fortis and Parties A, B, C, and D on November 23, 2015;

(e)     The details of the modifications Defendant Welch and Hayes discussed with Perry on January 8, 2016 with respect to providing additional flexibility regarding senior management succession planning;

(f)     The details of Party G's revised proposal delivered on February 8, 2016 during the Board meeting, including whether it reflected a collar provision and the basis for the Board's conclusion at the February 8, 2016 Board meeting "that the multiples of earnings at which ITC is valued and multiple of earnings at which companies in the industry in which Party G operated are valued would likely result in substantial degradation in value for ITC stockholders if the two companies were combined, and that there was a substantial risk that Fortis would abandon its pursuit of ITC, or adversely change the terms of its proposal, were ITC to delay the process for the period of time that Party G indicated it would require to finalize its proposal;"

(g)     The basis for which the Board may, in its discretion, pay Lazard an additional fee of up to $2 million; and

(h)     The date when Fortis began discussing Defendant Welch's continued employment with the combined company, including compensation, as well as the timing, nature, and content of all discussions concerning possible employment retention of any of ITC's officers, directors, or employees following consummation of the Proposed Transaction.  While the Registration Statement

discloses that there is a letter agreement between Defendant Welch and ITC (the "Welch Letter Agreement"), pursuant to which, effective as of December 21, 2016, Defendant Welch's employment will be "at-will," the Registration Statement fails to disclose any arrangements between Fortis and Defendant Welch or any of ITC's executives.  Such information must be disclosed as without it the Registration Statement is incomplete and misleading, particularly because Perry, Fortis' President and CEO, stated on Fortis' February 18, 2016 fourth quarter earnings call that, "ITC's management team will remain in place and all ITC employees will be retained."  Further, the Registration Statement states on page 112 that "[a]s of the date of the proxy statement, other than the arrangements discussed in this proxy statement, none of ITC's executive officers has entered into any agreement with Fortis regarding employment with, or compensation from, the surviving corporation or Fortis following completion of the merger." Yet, immediately on the next page, page 113, the Registration Statement states, "Fortis does not contemplate terminating any of the named executive officers in connection with the completion of the merger."

98.    The Registration Statement provides on page 67 the Board considered a number of factors in deciding to approve the Proposed Transaction, including, among other things strategic alternatives, strategic review process, and merger consideration.  Thus, the omission of the above information in subparagraphs (a)

through (h) is material to stockholders to determine for themselves whether a conflict-free and adequate sale process was conducted by the Board in connection with the Proposed Transaction.

99. With respect to Lazard's *Selected Comparable Company Multiples Analysis* on pages 76-78, the Registration Statement fails to disclose the individual financial metrics from each company used for the analysis. While the Registration Statement discloses the 2016 and 2017 P/E multiples range and 2016 and 2017 EBITDA multiple range, it fails to disclose whether these ranges represent the high-low or were derived based on the median/mean of the observed companies. The Registration Statement also fails to disclose the rational for equalizing the life of ITC's asset base in order to determine adjusted EBITDA. Specifically, the Registration Statement provides:

> The EPS and EBITDA estimates for each of the ITC comparable companies and the Fortis comparable companies used by Lazard in its analysis were based on Wall Street research, which represents publicly available consensus estimates. The following table summarizes the results of this review:

|  | ITC Comparable Companies Multiples | Fortis Comparable Companies Multiples |
|---|---|---|
| Share Price to 2016E EPS (2016 P/E Multiple) | 17.7x - 19.5x | 17.3x - 19.8x |
| Share Price to 2017E EPS (2017 P/E Multiple) | 16.9x - 18.3x | 16.3x - 18.4x |
| Enterprise Value to 2016E EBITDA | 9.1x - 11.4x | 8.2x - 11.4x |
| Enterprise Value to 2017E EBITDA | 8.7x - 10.8x | 7.8x - 10.8x |

> For comparability, Lazard equalized the depreciable life of ITC's asset base (average of approximately 52 years) with the average depreciable life of the ITC comparable companies (approximately 37 years). ITC's estimated EBITDA, as adjusted per the foregoing, is

referred to as Adjusted EBITDA in this section. Based on Lazard's analysis of the relevant metrics for each of the ITC comparable companies, as well as its professional judgment and experience, Lazard derived ranges of multiples of:

- 17.00x to 19.00x for 2016 P/E Multiple of ITC (applied to ITC's 2016E EPS of US$2.06) and 16.50x to 18.50x for 2017 P/E Multiple of ITC (applied to ITC's 2017E EPS of US$2.34); and

- 10.00x to 11.00x for enterprise value to 2016E Adjusted EBITDA of ITC (applied to ITC's 2016E Adjusted EBITDA of US$905 million) and 9.50x to 10.50x for enterprise value to 2017E Adjusted EBITDA of ITC (applied to ITC's 2017E Adjusted EBITDA of US$1,019 million).

Except as otherwise noted, throughout Lazard's analysis in this section, Fortis' financial information, including, without limitation, the financial projections in its management plan and closing share price, was converted to US dollars based on a Canadian dollar-to-US dollar exchange rate of 1.39 as of February 5, 2016. Based on Lazard's analysis of the relevant metrics for each of the Fortis comparable companies, as well as its professional judgment and experience, Lazard derived ranges of multiples of:

- 17.00x to 19.00x for 2016 P/E Multiple of Fortis (applied to Fortis' 2016E EPS of US$1.53) and 16.50x to 18.50x for 2017 P/E Multiple of Fortis (applied to Fortis' 2017E EPS of US$1.68); and

- 10.00x to 11.00x for enterprise value to 2016E EBITDA of Fortis (applied to Fortis' 2016E EBITDA of US$1,745 million) and 9.50x to 10.50x for enterprise value to 2017E EBITDA of Fortis (applied to Fortis' 2017E EBITDA of US$1,900 million).

Lazard applied each such range of multiples for the ITC comparable companies and the Fortis comparable companies to the relevant financial statistics of ITC and Fortis, respectively, as reflected in the ITC management plan for ITC, and the Fortis management plan for Fortis. Lazard averaged the results of these calculations and, from this analysis, estimated an implied value range for shares of ITC common stock and an implied value range for Fortis common shares.

This analysis resulted in an implied price per share range for shares of ITC common stock and Fortis common shares, as compared to the

| Implied ITC Price Per Share Range | Implied Fortis Price Per Share Range | Merger Consideration |
|---|---|---|
| US$34.50 - US$39.75 | US$26.25 - US$31.00 | US$22.57 in cash and 0.7520 Fortis common shares (equivalent to US$45.05 per share based upon Fortis' closing share price and the Canadian dollar-to-US dollar exchange rate on February 5, 2016) |

merger consideration as set forth below:

100. Information relating to Lazard's perspectives of the relative comparability of such companies to ITC is critical when evaluating this analysis performed by Lazard. The omissions mentioned in ¶ 99 are essential to stockholders' ability to properly evaluate the analysis performed by Lazard. Thus, the omissions identified in ¶ 99 render the Registration Statement false and/or misleading.

101. With respect to Lazard's *Discounted Cash Flow Analysis* ("DCF Analysis") on pages 78-79 prepared for both ITC and Fortis, in addition to the failure to disclose ITC's future cash flows (discussed below), the Registration Statement fails to disclose: (i) the inputs and assumptions used to derive the discount rates employed for ITC and Fortis in its analysis; (ii) the weighted average cost of capital ("WACC"); and (iii) an explanation of how the Canadian currency influenced Lazard's calculation of Fortis' WACC.

102.   The omission of the above information identified in ¶ 101 renders the following statements from the Registration Statement false and/or materially misleading:

> Lazard averaged the price per share ranges implied by these calculations and, based on that analysis, reviewed the implied price per share range for shares of ITC common stock and Fortis common shares, as compared to the merger consideration, as set forth below:

| Implied ITC Price Per Share Range | Implied Fortis Price Per Share Range | Merger Consideration |
|---|---|---|
| US$38.75 - US$45.75 | US$29.25 - US$35.25 | US$22.57 in cash and 0.7520 Fortis common shares (equivalent to US$45.05 per share based upon Fortis' closing share price and the Canadian dollar-to-US dollar exchange rate on February 5, 2016) |

103.   The statements made in the Registration Statement and the omissions identified in ¶ 101 relating to the DCF Analysis are false and misleading because DCF analyses are sensitive to derivations in the inputs used, it is imperative that stockholders be provided with the information underlying the implied discount rate ranges used for ITC and Fortis.  Without the omitted information identified in ¶ 101, ITC stockholders cannot understand and gauge the weight of the per share equity value ranges determined under this analysis.  Thus, stockholders cannot evaluate for themselves whether the DCF Analysis was performed properly when deciding to vote to approve the Proposed Transaction.

104.   With respect to Lazard's *Selected Precedent Transactions Multiples Analysis* on page 79, the Registration Statement fails to disclose the objective selection criteria and display the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics, as well as any other multiples (especially EBTIDA multiples) or transaction premiums examined.

105.   The omission of the above information identified in ¶ 104 renders the following statements from the Registration Statement false and/or materially misleading:

> To the extent publicly available, Lazard reviewed, among other things, the P/E Multiples of each of the target companies implied by the selected transactions by comparing the per share acquisition price to the relevant target company's estimated EPS at the time of the transaction for the fiscal year immediately following the fiscal year in which the relevant transaction was announced ("FY+1") and the following year thereafter ("FY+2"). Estimated EPS amounts for the target companies were based on publicly available Wall Street consensus estimates or other publicly available financial information and analyst research. The following table summarizes the results of this review:

| | Selected Precedent Transactions FY + 1 P/E Multiples | Selected Precedent Transactions FY + 2 P/E Multiples |
|---|---|---|
| High | 23.3x | 21.6x |
| 75th Percentile | 21.6x | 20.4x |
| Mean | 20.5x | 19.2x |
| Median | 20.1x | 18.6x |
| 25th Percentile | 19.7x | 18.3x |
| Low | 18.3x | 17.6x |

> Based on an analysis of the relevant metrics for each of the transactions, as well as its professional judgment and experience, Lazard applied a P/E Multiple range of 18.25x to 23.25x to the 2016E

EPS of ITC and a P/E Multiple range of 17.50x to 21.50x to the 2017E EPS of ITC.

Lazard averaged the selected precedent transactions' P/E Multiples and, based on that analysis, reviewed the implied price per share range for shares of ITC common stock, as compared to the merger consideration, as set forth below:

| Implied ITC Per Share Price Range | Merger Consideration |
|---|---|
| US$39.25 - US$49.00 | US$22.57 in cash and 0.7520 Fortis common shares (equivalent to US$45.05 per share based upon Fortis' closing share price and the Canadian dollar-to-US dollar exchange rate on February 5, 2016) |

106. Without the objective selection criteria used by Lazard and the individually observed multiples for the comparable transactions, ITC stockholders are unable to adequately assess whether ITC is being appropriately valued in relation to the selected precedent transactions. Thus, the omissions identified in ¶ 104 render the Registration Statement false and/or misleading.

107. With respect to Lazard's *Discounted Cash Flow Sensitivity Analysis* on page 82, Lazard performed an analysis similar to the DCF Analysis, but also included 10%, 25% and 100% of the Company's unlevered free cash flows associated with ITC's projects in Puerto Rico and Mexico. Notably, the Registration Statement fails to disclose the free cash flow and the cash flow calculations associated with the Puerto Rico and Mexico projects, which renders the following statements from the Registration Statement false and/or misleading:

Lazard performed a discounted cash flow sensitivity analysis of ITC using the same methodology as set forth above in "—Discounted Cash Flow Analysis," except Lazard also included 10%, 25% and 100% of the unlevered free cash flows associated with ITC's projects in Puerto Rico and Mexico. This analysis resulted in an implied price per share

| Implied ITC Price Per Share Range (10% of Additional Unlevered Free Cash Flows) | Implied ITC Price Per Share Range (25% of Additional Unlevered Free Cash Flows) | Implied ITC Price Per Share Range (100% of Additional Unlevered Free Cash Flows) | Merger Consideration |
|---|---|---|---|
| US$39.25 - US$46.25 | US$39.50 - US$47.00 | US$42.00 - US$50.00 | US$22.57 in cash and 0.7520 Fortis common shares (equivalent to US$45.05 per share based upon Fortis' closing share price and the Canadian dollar-to-US dollar exchange rate on February 5, 2016) |

range for shares of ITC common stock, as compared to the merger consideration, as set forth below:

108.   The statements made in the Registration Statement and the omissions identified in ¶ 107 are false and misleading because such omissions are essential to stockholders' ability to properly evaluate the analysis performed by Lazard, including whether there were any flaws in Lazard's analysis.

109.   With respect to Barclays' *Selected Comparable Company Analysis* for ITC on page 87, the Registration Statement fails to disclose the objective selection criteria used and display the observed company-by-company pricing multiples and financial metrics (especially those related to "sizes, growth prospects, profitability

levels," etc. referenced by Barclays as important) examined by Barclays, as well as any other multiples Barclays examined.

110.   The omissions identified in ¶ 109 renders the following statements from the Registration Statement false and/or misleading:

> Barclays calculated and compared various financial multiples and ratios of ITC, and those of the respective selected comparable companies. As part of its selected comparable company analysis, Barclays calculated and analyzed each company's last twelve months, or LTM, and 2016 forward looking (based on Thomson Reuters' Institutional Brokers' Estimate System, or I/B/E/S, consensus estimates) price-to-earnings, or P/E, and market price-to-book value, or P/B, ratios. All of these calculations were performed and based on publicly available financial data and closing prices, in each case as of February 5, 2016.

> Barclays selected the comparable companies listed above because their businesses and operating and regulatory profiles are reasonably similar to that of ITC. However, because of the inherent differences between the business, operations, regulations and prospects of ITC, and those of the selected comparable companies, Barclays believed that it was inappropriate to and, therefore, did not rely solely on the quantitative results of the selected comparable company analysis. Accordingly, Barclays also made certain qualitative judgments concerning differences between the business, financial, regulatory and operating characteristics and prospects of ITC and the selected comparable companies that could affect the public trading values of each in order to provide a context in which to consider the results of the quantitative analysis. These qualitative judgments related primarily to the differing sizes, growth prospects, profitability levels, regulatory frameworks and degree of operational risk between ITC and the companies included in the selected comparable company analysis. Based upon these judgments, Barclays selected a range of multiples for ITC and applied such range to the ITC Projections to calculate a range of implied prices per share of ITC common stock. The following summarizes the result of these calculations:

|  | Selected Multiple Range | Implied Value Per Share of ITC common stock |
|---|---|---|
| P/E | LTM P/E 18.5x - 20.5x | US$34.72 - US$38.60[1] |
|  | 2016E P/E 17.3x - 19.3x |  |
| P/B | 1.6x - 2.1x | US$17.42 - US$22.96 |

(1) This range of implied values per share reflects the average of the LTM and 2016E P/E multiples.

111.    Information relating to Barclays' perspectives of the relative comparability of such companies to ITC is critical when evaluating this analysis performed by Barclays.   The omissions mentioned in ¶ 109 are essential to a stockholder's ability to properly evaluate the analysis performance by Barclays and this, render the Registration Statement false and/or misleading.

112.    With respect to Barclays' *Selected Comparable Company Analysis* for Fortis on pages 90-91, the Registration Statement fails to disclose the objective selection criteria used and display the observed company-by-company pricing multiples and financial metrics (especially those related to "sizes, growth prospects, profitability levels," etc. referenced by Barclays as important) examined by Barclays, as well as any other multiples Barclays examined.   Instead, the Registration Statement only discloses Barclays' selected range of comparable transactions multiples, which were selected from the overall population of multiples for all of the comparable transactions.

113.    The omissions identified in ¶ 112 renders the following statements from the Registration Statement false and/or misleading:

Barclays calculated and compared various financial multiples and ratios of Fortis, and those of the respective selected comparable companies. As part of its selected comparable company analysis, Barclays calculated and analyzed each company's LTM P/E ratios, 2016E P/E ratios, and P/B ratios. All of these calculations were performed, and based on publicly available financial data and closing prices, in each case as of February 5, 2016. The results of this selected comparable company analysis are summarized below.

Barclays selected the comparable companies listed above because their businesses and operating and regulatory profiles are reasonably similar to that of Fortis. However, because of the inherent differences between the business, operations, regulations and prospects of Fortis, and those of the selected comparable companies, Barclays believed that it was inappropriate to, and therefore did not, rely solely on the quantitative results of the selected comparable company analysis. Accordingly, Barclays also made certain qualitative judgments concerning differences between the business, financial, regulatory and operating characteristics and prospects of Fortis and the selected comparable companies that could affect the public trading values of each in order to provide a context in which to consider the results of the quantitative analysis. These qualitative judgments related primarily to the differing sizes, growth prospects, profitability levels, regulatory frameworks and degree of operational risk between Fortis and the companies included in the selected comparable company analysis. Based upon these judgments, Barclays selected a range of multiples for Fortis and applied such range to the Fortis Projections to calculate a range of implied price per Fortis common share. The following summarizes the result of these calculations:

| | Selected Multiple Range | Implied Value Per Share of ITC common stock |
|---|---|---|
| P/E | LTM P/E 18.3x - 20.3x | US$27.00 - US$30.00[1] |
| | 2016E P/E 17.7x - 19.7x | |
| P/B | 1.8x - 2.3x | US$37.59 - US$47.91 |

(1)This range of implied values per share reflects the average of the LTM and 2016E P/E multiples.

Barclays noted that on the basis of the selected comparable company analysis with respect to Fortis, the closing price of US$29.89 per share, the last full trading prior to the rendering of its opinion, was (i) within the range of implied values per Fortis common share using the selected P/E multiples, and (ii) below the range of implied values per Fortis common share using the selected P/B multiples, in each case using the Fortis Projections.

114.   Information relating to Barclays' perspectives of the relative comparability of such companies to Fortis is critical when evaluating this analysis performed by Barclays.   The omissions mentioned in ¶ 112 are essential to a stockholder's ability to properly evaluate the analysis performed by Barclays and thus, render the Registration Statement false and/or misleading.

115.   With respect to Barclays' *Selected Precedent Transaction Analysis* on page 88, the Registration Statement fails to disclose the objective selection criteria used and display the observed transaction-by-transaction enterprise values, pricing multiples, and financial metrics, as well as any other multiples or transaction premiums examined.   Instead, the Registration Statement only discloses Barclays' selected range of comparable transactions multiples, which were selected from the overall population of multiples for all of the comparable transactions.

116.   The omissions identified in ¶ 115 renders the following statements from the Registration Statement false and/or misleading:

The reasons for and the circumstances surrounding each of the selected precedent transactions analyzed were diverse and there are inherent differences in the business, operations, financial conditions

and prospects of ITC and the companies included in the selected precedent transaction analysis. Accordingly, Barclays believed that a purely quantitative selected precedent transaction analysis would not be particularly meaningful in the context of considering the merger. Barclays, therefore, made certain qualitative judgments concerning differences between the characteristics of the selected precedent transactions and the merger which would affect the acquisition values of the selected target companies and ITC. Based upon these judgments, Barclays selected a range of multiples for ITC and applied such range to the ITC Projections to calculate a range of implied prices per share of ITC common stock. The following table sets forth the results of such analysis:

| | Selected Multiple Range | Implied Value Per Share of ITC common stock |
|---|---|---|
| FY1 P/E | 18.0x - 25.0x | US$37.12 - US$51.55 |
| EV/Rate Base | 1.5x - 2.1x | US$20.71 - US$41.70 |
| P/B | 1.6x - 2.5x | US$17.47 - US$28.11 |

Barclays noted that on the basis of the selected precedent transaction analysis, the implied value of the merger consideration of US$45.05 was (i) within the range of implied values per share of ITC common stock calculated using P/E ratios, and (ii) above the ranges of implied values per share of ITC common stock calculating using EV/Rate Base and P/B ratios, in each case utilizing the ITC Projections.

117. The omitted information identified in ¶ 115 is material to ITC stockholders' ability to observe any flaws in Barclays' analysis and to assess the reliability of the analysis as supporting the fairness of the merger consideration. Without the omitted information, ITC stockholders are unable to determine whether the ranges accurately reflect the value of their ITC shares. Thus, the omissions identified in ¶ 115 render the Registration Statement false and/or misleading.

118.   With respect to Barclays' *Discounted Cash Flow Analysis* prepared for ITC on page 89, in addition to the failure to disclose ITC's future cash flows, the Registration Statement fails to disclose: (i) the inputs and assumptions used to derive the discount rates employed for ITC in its analysis; and (ii) the WACC.

119.   The omission of the above information renders the following statements from the Registration Statement false and/or materially misleading: "The result of this analysis implied a range of values per share of ITC common stock of US$40.62 to US$46.66."

120.   With respect to Barclays' *Discounted Cash Flow Analysis* prepared for Fortis on page 91, in addition to the failure to disclose ITC's future cash flows, the Registration Statement fails to disclose: (i) the inputs and assumptions used to derive the discount rates employed for Fortis in its analysis; and (ii) the WACC.

121.   The omission of the above information renders the following statements from the Registration Statement false and/or materially misleading:

> The result of this analysis implied a range of values per Fortis common share of $36.07 to $41.29. Barclays noted that on the basis of the DCF analysis, the closing price of $41.47 per Fortis common share (US$29.89, based on a US dollar-to-Canadian dollar exchange ratio of 0.72086 as of February 5, 2016) on February 5, 2016, the last full trading day prior to rendering of its opinion, was below the range of implied values per Fortis common share calculated using the Fortis Projections.

122.   The statements made in the Registration Statement and the omissions identified in ¶¶ 118, 120 relating to the DCF Analyses performed by Barclays for

ITC and Fortis are false and misleading because DCF analyses are sensitive to derivations in the inputs used, it is imperative that stockholders be provided with the information underlying the implied discount rate ranges used for ITC and Fortis.   Without the omitted information identified in ¶¶ 118, 120, ITC stockholders cannot understand and gauge the weight of the per share equity value ranges determined under this analysis.   Thus, stockholders cannot evaluate for themselves whether the DCF Analyses was performed properly when deciding to vote to approve the Proposed Transaction.

123.   With respect to Morgan Stanley's *Comparable Public Companies Analysis* on pages 95-96 as it related to ITC, the Registration Statement fails to disclose the individual financial metrics from each company used for the multiples analysis (stock price to 2016 estimated unadjusted EPS, stock price to 2016 estimated adjusted EPS, and stock price to 2017 estimated EPS).   Additionally, while the Registration Statement discloses the Price to EPS multiples ranges, it fails to disclose whether these ranges represent the high-low or were derived based on the median/mean of the observed companies.   The Registration Statement also fails to disclose the individually observed multiples for each of the comparable companies.

124.   The omission of the above information renders the following statements from the Registration Statement false and/or materially misleading:

The following table reflects the multiple of price to estimated EPS for 2016 and estimated EPS for 2017 for the companies included in the comparable companies analysis based on a compilation of earnings estimates by selected equity research analysts:

| Metric | Company Comparable Companies Multiples |
|---|---|
| Stock Price to 2016 estimated unadjusted EPS | 17.2x - 19.8x |
| Stock Price to 2016 estimated EPS | 17.2x - 19.8x |
| Stock Price to 2017 estimated EPS | 16.1x - 18.5x |

Applying the ranges of multiples that were derived from the comparable public companies analysis and based on Morgan Stanley's judgment, Morgan Stanley calculated a range of implied equity values per share of ITC common stock with respect to the following metrics:

- stock price to 2016 estimated unadjusted EPS;
- stock price to 2016 estimated adjusted EPS; and
- stock price to 2017 estimated EPS.

Based on this analysis, Morgan Stanley derived a range of approximate implied equity value per share of ITC common stock as follows:

- stock price to 2016 estimated unadjusted EPS—US$35.50 - US$41.00;
- stock price to 2016 estimated adjusted EPS—US$39.00 - US$45.00; and
- stock price to 2017 estimated EPS—US$37.50 - US$43.25,

as compared to the merger consideration of US$45.05 as of February 5, 2016 (based on US$22.57 in cash, 0.7520 of a Fortis common share per share of ITC common stock, a Fortis common share price of $29.89, and a US dollar-to-Canadian dollar exchange rate of 0.7209).

125. The omitted information identified in ¶ 123 is material to ITC stockholders' ability to observe any flaws in Morgan Stanley's analysis. Without the omitted information, ITC stockholders are unable to determine whether the

ranges accurately reflect the value of their ITC shares.  Thus, the omissions identified in ¶ 123 render the Registration Statement false and/or misleading.

126.  With respect to Morgan Stanley's *Comparable Companies Analysis* on pages 98-99 as it relates to Fortis and based on similar inputs, the Registration Statement fails to disclose the individual financial metrics from each company used for the multiples analysis (stock price to 2016 estimated unadjusted EPS, stock price to 2016 estimated adjusted EPS, and stock price to 2017 estimated EPS).  Additionally, while the Registration Statement discloses the Price to EPS multiples ranges, it fails to disclose whether these ranges represent the high-low or were derived based on the median/mean of the observed companies.  The Registration Statement also fails to disclose the individually observed multiples for each of the comparable companies.

127.  The omission of the above information renders the following statements from the Registration Statement false and/or materially misleading:

The following table reflects the multiple of price to estimated EPS for 2016 and estimated EPS for 2017 for the companies included in the comparable companies analysis based on a compilation of earnings estimates by selected equity research analysts:

| Metric | Company Comparable Companies Multiples |
|---|---|
| Stock Price to 2016 estimated EPS | 16.8x - 19.4x |
| Stock Price to 2017 estimated EPS | 15.9x - 16.8x |

Applying the ranges of multiples that were derived from the comparable public companies analysis and based on Morgan Stanley's judgment, Morgan Stanley calculated a range of implied equity values per Fortis common share with respect to the following metrics:

- stock price to 2016 estimated EPS; and
- stock price to 2017 estimated EPS.

Based on this analysis, Morgan Stanley derived a range of approximate implied equity value per Fortis common share as follows:

- stock price to 2016 estimated adjusted EPS—US$25.75 - US$29.50; and
- stock price to 2017 estimated EPS—US$26.75 - US$28.25.

128. The omitted information identified in ¶ 126 is material to ITC stockholders' ability to observe any flaws in Morgan Stanley's analysis. Without the omitted information, ITC stockholders are unable to determine whether the ranges accurately reflect the value Fortis. Thus, the omissions identified in ¶ 126 render the Registration Statement false and/or misleading.

129. With respect to Morgan Stanley's *Discounted Cash Flow Analysis* on pages 96-97 prepared for ITC, in addition to the failure to disclose ITC's future cash flows, the Registration Statement fails to disclose: (i) the inputs and assumptions used to derive the discount rates employed for ITC in its analysis; and (ii) the WACC.

130.   The omission of the information identified in ¶ 129 renders the following statements from the Registration Statement false and/or materially misleading:

> In performing a discounted cash flow analysis of ITC, Morgan Stanley first calculated the estimated unlevered free cash flows of ITC and then calculated a terminal value for ITC by applying a 17.9x to 21.1x range of terminal value multiples to ITC's terminal year 2020 estimated net income. The terminal value multiple range was derived from the stock price to the last 12 months' EPS multiples for the companies in the comparable public companies analysis. Unlevered free cash flows were calculated by tax-effecting earnings before interest and taxes and adding back the aggregate of depreciation and amortization, deferred taxes and other cash flow adjustments provided by management less the sum of capital expenditures and investment in working capital. The free cash flows and range of terminal values were then discounted to present values as of December 31, 2015 using discount rates ranging from 4.0% to 5.1%, which were chosen by Morgan Stanley based upon prevailing interest rates and Morgan Stanley's judgment of the estimated range of ITC's weighted average cost of capital. This analysis indicated approximate implied equity value per share reference ranges for ITC common stock of US$39.00 to US$49.75, as compared to the merger consideration of US$45.05 as of February 5, 2016 (based on US$22.57 in cash and 0.7520 of a Fortis common share per share of ITC common stock, a Fortis share price of US$29.89 and a US dollar-to-Canadian dollar exchange rate of 0.7209).

131.   With respect to Morgan Stanley's *Discounted Cash Flow Analysis* on pages 99-100 prepared for Fortis, in addition to the failure to disclose Fortis' future cash flows, the Registration Statement fails to disclose: (i) the inputs and assumptions used to derive the discount rates employed for Fortis in its analysis; and (ii) the WACC.

132.   The omission of the information identified in ¶ 131 renders the following statements from the Registration Statement false and/or materially misleading:

> In performing a discounted cash flow analysis of Fortis, Morgan Stanley first calculated the estimated unlevered free cash flows of Fortis and then calculated a terminal value for Fortis by applying a 19.2x to 20.4x range of terminal value multiples to Fortis' terminal year 2020 estimated net income. The terminal value multiple range was derived from the stock price to the last 12 months' EPS multiples for the companies in the comparable public companies analysis. Unlevered free cash flows were calculated by tax-effecting earnings before interest and taxes and adding back the aggregate of depreciation and amortization, deferred taxes and other cash flow adjustments provided by management less the sum of capital expenditures and investment in working capital. The free cash flows and range of terminal values were then discounted to present values as of December 31, 2015 using discount rates ranging from 4.0% to 4.9%, which were chosen by Morgan Stanley based upon prevailing interest rates and Morgan Stanley's judgment of the estimated range of Fortis' weighted average cost of capital. This analysis indicated approximate implied equity value per share reference ranges for Fortis common shares of US$33.75 to US$38.75.

133.   The statements made in the Registration Statement and the omissions identified in ¶¶ 129, 131 relating to the DCF Analyses performed by Morgan Stanley for ITC and Fortis are false and misleading because DCF analyses are sensitive to derivations in the inputs used, it is imperative that stockholders be provided with the information underlying the implied discount rate ranges used for ITC and Fortis.  Without the omitted information identified in ¶¶ 129, 131, ITC stockholders cannot understand and gauge the weight of the per share equity value

ranges determined under these analyses.  Thus, stockholders cannot evaluate for themselves whether the DCF Analyses was performed properly when deciding to vote to approve the Proposed Transaction.

134.  With respect to Morgan Stanley's *Analysis of Selected Precedent Transactions and Premiums Paid* on pages 97-98, the Registration Statement fails to disclose the individually observed multiples and premiums for each of the transactions.

135.  The omission of the information identified in ¶ 134 renders the following statements from the Registration Statement false and/or materially misleading:

> Morgan Stanley compared certain financial and market statistics of the selected precedent transactions. Based on an assessment of the utility acquisitions, Morgan Stanley applied a premium to the price as of the unaffected date of US$33.75 ranging from 14.7% to 48.3%, as well as a multiple to ITC's 2016 estimated unadjusted earnings ranging from 18.3x - 23.3x. Based on the analysis of utility acquisitions, Morgan Stanley calculated an approximate per-share price for ITC common stock ranging from US$38.75 to US$50.00 (in the case of the premium to unaffected share price), and US$37.75 to US$48.00 (in the case of the multiple to ITC's estimate of its 2016 estimated unadjusted earnings), as compared to the merger consideration of US$45.05 as of February 5, 2016 (based on US$22.57 in cash and 0.7520 of a Fortis common share per share of ITC common stock, a Fortis common share price of US$29.89 and a US dollar-to-Canadian dollar exchange rate of 0.7209).

> No company or transaction utilized as a comparison in the analysis of selected precedent transactions is identical to ITC or the merger in business mix, timing and size. Accordingly, an analysis of the results of the foregoing necessarily involves complex considerations and

judgments concerning differences in financial and operating characteristics of ITC and other factors that would affect the value of the companies to which ITC is being compared. In evaluating the precedent transactions, Morgan Stanley made judgments and assumptions with regard to industry performance, global business, economic, market and financial conditions and other matters, many of which are beyond ITC's control, such as the impact of competition on ITC and the industry generally, industry growth and the absence of any adverse material change in the financial conditions and prospects of ITC or the industry or the financial markets in general. Mathematical analysis (such as determining the mean or median) is not, in itself, a meaningful method of using precedent transactions data.

136. The omitted information identified in ¶ 134 is material to ITC stockholders' ability to observe any flaws in Morgan Stanley's analysis. Thus, the omissions identified in ¶ 134 render the Registration Statement false and/or misleading.

137. Lastly, the Registration Statement does not disclose material information concerning ITC and Fortis management's financial projections. On page 67, the Registration Statements states that the Board relied on ITC's financial plan and on page 71 states that "near term financing needs given its strong operating cash flows . . . its strong free cash flow profile." Additionally, the Board relied on forecasts for 2016-2020 and also provided these forecasts to certain interested parties. Further, the Registration Statement provides that Lazard, Barclays and Morgan Stanley utilized ITC and Fortis' projections, including future cash flows, for certain of their analyses, such as the DCF analyses.

138.   Moreover, the Registration Statement fails to disclose the ITC Management Projections on page 104, provided by ITC management, for years 2016-2020, for the following line items: (i) unlevered free cash flows; (ii) reconciliation of GAAP net income to non-GAAP unlevered free cash flows and non-GAAP EBITDA/Adjusted EBITDA; (iii) adjusted EBITDA, if different from EBITDA, and if not different, an appropriate clarification; and (iv) dividends.

139.   Similarly, as it related to Fortis, the Registration Statement fails to disclose the Financial Projections Relating to Fortis Considered by ITC Management on pages 104-105, for years 2016-2020, for the following line items: (i) capital investments; (ii) average rate base and CWIP; (iii) unlevered free cash flows; (iv) reconciliation of GAAP net income to non-GAAP unlevered free cash flows and non-GAAP EBITDA/Adjusted EBITDA; (v) adjusted EBITDA, if different from EBITDA; and (vi) dividends.

140.   The omitted information identified in ¶¶ 138-139 is material to ITC stockholders' evaluation of the merger consideration being offered in the Proposed Transaction.   Indeed, with respect to ITC's projections, such projected financial information provides a sneak peek into ITC's expected future performance and its value as a standalone entity.

141.   Defendants failure to provide ITC's stockholders with the foregoing material information constitutes a violation of Sections 14(a) and 20(a) of the

Exchange Act, and Rule 14a-9 promulgated thereunder.   The Individual Defendants were aware of their duty to disclose this information, and acted with at least negligence in failing to include it in the Registration Statement.  The material information described above that was omitted from the Registration Statement takes on actual significance in the minds of ITC's stockholders in reaching their decision whether to vote in favor of the Proposed Transaction.  Absent disclosure of this material information prior to the vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision about whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm for which damages are not an adequate remedy.

142.   Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
**Individual Claim for Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and ITC**

143.   Plaintiff repeats all previous allegations as if set forth in full herein.

144.   The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which

they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  ITC is liable as the issuer of these statements.

145.  The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

146.  The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

147.  The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

148.  The Registration Statement is an essential link in causing Plaintiff to approve the Proposed Transaction.

149.  By reason of the foregoing, Defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

150.   Because of the false and misleading statements in the Registration. Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**
**Individual Claim for Violation of Section 20(a) and the Exchange Act Against the Individual Defendants and Fortis**

151.   Plaintiff repeats all previous allegations as if set forth in full herein.

152.   The Individual Defendants and Fortis acted as controlling persons of ITC within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of ITC and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

153.   Each of the Individual Defendants and Fortis was provided with or had unlimited access to copies of the Registration Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

154.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and,

therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.   They were thus directly in the making of the Registration Statement.

155.   Fortis also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

156.   By virtue of the foregoing, the Individual Defendants and Fortis violated Section 20(a) of the 1934 Act.

157.   As set forth above, the Individual Defendants and Fortis had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the 1934 Act.   As a direct and proximate result of Defendants' conduct, Plaintiff is threatened with irreparable harm.

## COUNT III
## Claim for Breach of Fiduciary Duties Against the Individual Defendants

158.   Plaintiff repeats all previous allegations as if set forth in full herein.

159.   The Individual Defendants have violated fiduciary duties of care, loyalty, and good faith owed to the public stockholders of ITC.

160.   By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and the other members of the Class of the true value of their investment in ITC, and have failed to provide stockholders with material information necessary for them to make an informed vote on the Proposed Transaction.

161.   As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their fiduciary duties of loyalty, good faith, and independence owed to the stockholders of ITC because, among other reasons, they failed to take steps to maximize the value of ITC to its public stockholders, and failed to disclose material information regarding the Proposed Transaction.

162.   The Individual Defendants dominate and control the business and corporate affairs of ITC, and are in possession of private corporate information concerning ITC assets, business and future prospects.   Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of ITC which makes it inherently unfair for them to benefit from their own interests to the exclusion of maximizing stockholder value.

163.   By reason of the foregoing acts, practices and courses of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

164.   As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of ITC's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

165.   Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

166.   Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to file a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that Defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 22, 2016

**SOMMERS  SCHWARTZ,  P.C.**

By:  /s/ *Lance C. Young*
_____

**OF COUNSEL:**

Lance C. Young
One Towne Square, 17th Floor

**LEVI & KORSINSKY LLP**

Southfield, MI 48076

Donald J. Enright

(248) 355-0300

1101 30th Street, N.W.

lyoung@sommerspc.com

Suite 115

(P51254)

Washington, DC 20007

(202) 524-4290

*Attorneys for Plaintiff*